IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED TELEPHONE COMPANY : <br> OF OHIO dba CENTURYLINK : <br>  665 Lexington Avenue : <br>  Mansfield, Ohio 44907 : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> AMERITECH SERVICES, INC. : <br> dba AT&T MIDWEST SERVICES : <br>  2000 W. SBC Center Drive : <br>  Hoffman Estates, IL 60196 : <br> : <br> Defendant. : | Case No. <br><br> Judge <br><br> Magistrate Judge |

## COMPLAINT

Now comes plaintiff United Telephone Company of Ohio d/b/a CENTURYLINK and, for its complaint against defendant Ameritech Custom Business Services, Inc. d/b/a AT&T Midwest Services, states as follows:

### THE PARTIES

#### Plaintiff

1. United Telephone Company of Ohio, d/b/a CENTURYLINK, ("Plaintiff") is a subsidiary of Century Tel, Inc. and possesses a Certificate of Public Convenience and Necessity issued by the Public Utilities Commission of Ohio that authorizes Plaintiff to transmit telephonic messages to, from, through, and within the State of Ohio.

2. Plaintiff provides telephone exchange service, exchange access, and other telecommunications and information services to more than 400,000 residential and enterprise consumers of communication services within the State of Ohio.

**Defendant**

3. Defendant, Ameritech Custom Business Services is a division of Ameritech Services, Inc. d/b/a AT&T Midwest Services ("Defendant") is, either directly or indirectly, a wholly owned subsidiary of AT&T, Inc. ("AT&T").

4. AT&T is the largest communications holding company in the world. Through its numerous operating companies, it provides its customers with more than 49 million access lines, 17.3 million high speed internet connections, and more than 3.5 million video subscriptions.

5. Defendant is among the many corporate affiliates of The Ohio Bell Telephone Company, an AT&T operating company that holds a Certificate of Public Convenience and Necessity issued by the Public Utilities Commission of Ohio authorizing it to transmit telephonic messages to, from, through, and within the State of Ohio, and that provides telephone exchange service, exchange access, and other telecommunications and information services to residential and enterprise consumers of communication services within the State of Ohio.

**JURISDICTION AND VENUE**

6. Plaintiff is a corporation organized and existing pursuant to the laws of the State of Ohio and has its principal business office located in the city of Mansfield, Ohio.

7. Defendant is a corporation organized and existing pursuant to the laws of the State of Delaware and has its principal business office located in the city of Hoffman Estates, Illinois.

8. This Court has subject matter jurisdiction over this dispute pursuant to 29 U.S.C. § 1332 because complete diversity of citizenship exists between plaintiff, on the one hand, and defendant on the other, and the amount in controversy between them exceeds $75,000.00.

9. This Court may exercise its subject matter jurisdiction over this dispute because the Subcontract upon which this complaint is based was entered into for the purpose of providing reduced rates to the State of Ohio, because Ohio Revised Code section 4905.34 expressly declares all such contracts valid and enforceable, and because the Ohio Supreme Court has determined that the Public Utilities Commission of Ohio ("PUCO") has no jurisdiction over contracts subject to Ohio Revised Code section 4905.34. (*Ohio Edison Co. v. PUCO*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922, 926 (1997)).

10. Venue is proper within this district because Defendant conducts business throughout the State of Ohio, and because numerous acts and omissions giving rise to these claims have occurred within this district within the State of Ohio.

11. Venue is proper within this district because this dispute arises out of contracts negotiated, executed, and performed within the State of Ohio, including within this district.

## BACKGROUND TO PLAINTIFF'S CLAIMS

### The SOMACS Project

12. On July 15, 1995, the State of Ohio, Department of Administrative Services ("SODAS") issued a request for proposal (the "RFP"), seeking a vendor or vendors to construct, operate, manage and lease to the State a state-wide communication network to be known as the State of Ohio Multi-Agency Communications System ("SOMACS.")

13. SOMACS was to be an integrated, highly sophisticated, state-of-the-art communication network consisting of a fiber optic backbone, one or more locations within every Ohio

county providing access to the fiber optic backbone (a "Network Access Point" or "NAP"), and high speed communication pathways between the NAPs and state facilities, either directly or indirectly through local exchange facilities belonging to telephone companies.

14. As further described by SODAS, SOMACS was to be capable well into the 21st century of meeting all voice, data, and video networking needs of the entire government of the State of Ohio, including all administrative agencies, anywhere within the State of Ohio.

15. As further described by SODAS, SOMACS was to be capable of integration with a number of communication networks then serving the State, including without limitation the Ohio Educational Broadcast System, the Multi-Agency Radio Communication System, and the Ohio Lottery Network.

16. In addition to its desire to meet the needs of the State of Ohio itself, SODAS was seeking a communication network that could also be made available to local governments, local school districts, colleges and universities, libraries, health care facilities, and other enterprises anywhere within the State of Ohio.

17. Within the RFP, SODAS also sought to make so-called "postalized" pricing available to all instrumentalities of state government, such that once the necessary communication facilities were built, the most commonly desired communication services and products would be available through SOMACS to the State of Ohio at the same price without regard to the identity of the agency, the identity of the provider, or the location at which the service or product was made available.

18. Section 3.0 of the RFP reads in its entirety as follows:

> All pricing terms and conditions submitted in the contractor responses **shall remain firm for a period of one hundred twenty (120) calendar**

> **days** after the scheduled RFP due date, or until the Controlling Board approves the selection and a Purchase Order is issued, whichever is sooner.  The Contract will be valid and enforceable for a period of up to approximately two (2) years from the Contract execution date, ending with the State biennial budget (See Section. 3.3).

19. Section 3.3 of the RFP reads in relevant part as follows:

    > Subject to lawful appropriations of the Ohio General Assembly and State Constitutional and statutory laws and requirements, the State intends to renew the Contract in subsequent bienniums.  **Prices shall not increase during that period.**

(Emphasis supplied.)

20. Section 3.33 of the RFP reads in its entirety as follows:

    > State university, non-profit and other governmental units may be offered pricing at rates equal to or higher than those prices offered to state agencies ordered by DAS Telecom.  State agencies charges shall be reduced to the lowest prices offered any customer of equal or smaller volumes (than the total contracted by DAS) if those become lower than prices quoted in the Contract.

21. SODAS indicated its preference for a single vendor that would assume responsibility to SODAS for all construction, operation, service, security, and billing issues in any way related to the SOMACS network.

### The joint response to the SOMACS RFP

22. When SODAS issued the SOMACS RFP, no single entity possessed, nor could any single entity even assemble, the regulatory authority necessary in order to provide SODAS with all the communication products and services it was seeking, in all locations throughout Ohio at which SODAS was seeking service.

23. In order to respond to the RFP, eighteen different local exchange companies ("LECs") including both Plaintiff and Defendant's affiliate, The Ohio Bell Telephone Company

5

d/b/a/ Ameritech Ohio ("Ameritech Ohio"), formed an alliance known as the Ohio Telephone Group ("OTG.")

24. Even together, the eighteen OTG Members still lacked the complete regulatory authority necessary to provide the services SODAS desired and thus OTG joined forces with still another communication service provider, LCI International, Inc. ("LCI"), an interexchange carrier, or "IXC", in order to prepare a joint response to the RFP.

25. In order to clearly set forth their respective rights and obligations regarding a joint response to the RFP, on, about, or as of August 1, 1995 Plaintiff and Defendant entered into a teaming agreement (the "Teaming Agreement").

26. Upon information and belief, Defendant entered into at least somewhat similar teaming agreements with other members of OTG and with LCI.

27. Pursuant to the terms of the Teaming Agreement, Defendant assumed exclusive responsibility for all contacts and communications with SODAS.

28. Pursuant to the express terms of the Teaming Agreement, Defendant assumed final responsibility for preparing and submitting the OTG/LCI joint response to SODAS.

29. In the joint response, and with Plaintiff's acquiescence, Defendant proposed that it serve as prime contractor for the SOMACS project, and that it serve as the sole point of contract between SODAS and OTG/LCI.

30. Pursuant to the terms of the Teaming Agreement Plaintiff would be responsible, within its service territory only, for designing and construction of the SOMACS backbone, and for providing the high speed connections between the NAPs and any facility connecting to SOMACS.

31. In support of the OTG/LCI response to the RFP, Plaintiff provided Defendant with proposed pricing for its services and products that was lower than the rates contained within Plaintiff's 1995 PUCO-approved tariffs, although still sufficient to recover the average costs, plus a return, that Plaintiff would incur to provide the services and products SODAS sought within Plaintiff's service territory.

32. Upon information and belief, Defendant used the pricing proposed by each OTG member to determine an average cost of certain services and products, and to calculate "postalized rates" that would recover at least that average cost plus Defendant's administration costs.

33. Defendant offered these "postalized" rates, together with certain other, site specific rates, to SODAS as SODAS requested.

34. SODAS notified Defendant that the OTG/LCI group had been tentatively awarded the SOMACS contracts.

### The Prime Contract

35. On, about, or as of January 30, 1996, SODAS, LCI, and Defendant entered into the Synchronous Optical Network (SONET) Infrastructure Contract, attached hereto as Exhibit A (the "Prime Contract").

36. The Prime Contract provides for construction, operation, management, service, and pricing of services and products associated with the SOMACS network.

37. The Prime Contract incorporates rates included in the response to the RFP, including the postalized rates determined by Defendant based upon the aggregate average rates submitted to Defendant by all members of OTG.

38. Pursuant to the terms of the Prime Contract, SODAS, Defendant and LCI are the only parties to the Prime Contract and, at all times pertinent hereto, Defendant has been the

only permissible point of contact regarding SOMACS between SODAS and OTG members.

## The Subcontract

39. On, about, or as of February 8, 1996, Defendant and Plaintiff entered into a Subcontractor Agreement, attached hereto as Exhibit B (the "Subcontract ") for the express purpose of setting forth their respective rights and obligations with respect to the SOMACS Project.

40. Pursuant to the express terms of paragraph 3(b) the Subcontract:

> [Defendant] agrees to from time to time, and as telecommunications service manager for SODAS, order in SODAS' name those services offered by [Plaintiff] in the Proposal, and [Plaintiff] agrees that it shall provide within its geographic serving area those ordered services to SODAS **in accordance with this Agreement. . . .**  (Emphasis supplied.)

41. Pursuant to the express terms of paragraph 3(a) the Subcontract:

> [Plaintiff] reaffirms that **the prices it quoted in the Proposal,** which prices are attached hereto and incorporated in this Agreement by this reference, **shall be firm for ten (10) years from the date of this Agreement.**  (Emphasis supplied.)

42. Pursuant to the terms of paragraph 4 of the Subcontract, Plaintiff further agreed that it would not invoice SODAS for the services and products provided via SOMACS, but would instead deliver invoices for any services and products related to SOMACS to Defendant.

43. Pursuant to the terms of paragraph 4 of the Subcontract, Defendant, in turn agreed to present a consolidated bill to SODAS for all SOMACS related products and services, accept a consolidated payment from SODAS for the products and services of all OTG members, and remit to Plaintiff the amount due Plaintiff under the Subcontract.

44. Upon information and belief, as agent for SODAS, Defendant insisted that Plaintiff commit to firm pricing within the Subcontract in order to protect either SODAS or itself

or both from the potential of price increases during the term of the Subcontract, and/or to limit the burden to Defendant of administering potentially frequent changes in price by OTG members.

### The Period From 1996 to 2006

45. The Telecommunications Act of 1996 resulted in vast changes in the market for telecommunication markets and has generally driven both the cost and the price of high speed telecommunication services downward.

46. Plaintiff has responded, from time to time, to changes in the market by reducing the price of many of the products and services available to the public through its PUCO-approved tariffs.

47. Whether inadvertently and in error, or deliberately in recognition of the pricing available through Plaintiff's tariffs, for a period of approximately nine years after the Prime Contract and the Subcontract were executed Defendant, as agent and telecommunications service manager for SODAS, ordered products and services desired by SODAS from Plaintiff pursuant to Plaintiff's PUCO-approved tariffs rather than through the Subcontract.

48. Pursuant to the express terms of paragraph 5(b) of the Subcontract:

> In the event of any conflict, inconsistency or incongruity between this Agreement and [Plaintiff's] tariff(s), **this Agreement shall govern and control.** (Emphasis supplied.)

49. Whether inadvertently or deliberately, Defendant has engaged in a scheme of arbitrage through which it billed SODAS the rates set forth in the Prime Contract but remitted payment to Plaintiff based upon rates approved from time to time in Plaintiff's PUCO tariffs instead of the firm price it negotiated for and obtained through the Subcontract.

## COUNT ONE
### Breach of Contract

50. The allegations of paragraph 1 –49 are incorporated by reference as though repeated fully herein.

51. At all times pertinent hereto as required by section 3(b) of the Subcontract, Plaintiff has provided within its geographic serving area those products and services related to SOMACS that Defendant has ordered on behalf of SODAS in accordance with the Subcontract.

52. At all times pertinent hereto, and in return for the SOMACS related products and services provided by Plaintiff, Defendant collected payment from SODAS at rates contained in the Prime Contract.

53. Despite demand, Defendant has failed and refuses to remit payment to Plaintiff based upon rates contained in the Subcontract.

54. Plaintiff and Defendant agree that when applied to all products and services provided by Plaintiff to SODAS between 1996 and 2006, the difference in the Subcontract Rates and the tariff rates equals $5,170,713.00.

WHEREFORE, Plaintiff United Telephone Company of Ohio d/b/a CENTURYLINK respectfully prays the Court to enter a judgment that awards damages in the amount of $5,170,713.00 in its favor and against Defendant Ameritech Custom Business Services, Inc. d/b/a AT&T Midwest Services, together with pre-judgment and post-judgment interest, and such further relief, at law or in equity, as the Court may deem just and proper.

/s/ Michael D. Dortch
Michael D. Dortch (0043897)
KRAVITZ, BROWN & DORTCH, LLC
65 East State Street
Suite 200
Columbus, OH 43215
Tel: (614) 464-2000
Fax: (614) 464-2002
E-mail: mdortch@kravitzllc.com

Trial Attorney for Plaintiff
UNITED TELEPHONE COMPANY OF OHIO
d/b/a CENTURYLINK